UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>655 CORPORATION,<br>Debtor. | CHAPTER 7<br>CASE NO. 06-13020-JNF |
| MARK G. DEGIACOMO, CHAPTER 11 TRUSTEE OF THE ESTATE OF 655 CORPORATION,<br>Plaintiff<br>v.<br><br>LBM FINANCIAL, LLC,<br>Defendant.<br><br>v.<br><br>CATHAY BANK,<br><br>Reach and Apply Defendant | ADVERSARY PROCEEDING<br>NO. 08- |

**VERIFIED ADVERSARY COMPLAINT**

**JURISDICTION, VENUE AND STANDING**

1. The Plaintiff brings this adversary proceeding pursuant to 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

2. This is a core proceeding, as defined in 28 U.S.C. § 157, relating directly to the property and affairs of the debtor and the administration of the debtor's estate. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K) and (O).

3. This proceeding arises under title 11 and arises in a bankruptcy case that is pending in the District of Massachusetts, Eastern Division, and therefore, venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

4. The Plaintiff, Mark G. DeGiacomo, is the duly appointed Chapter 11 Trustee (the "Plaintiff" or "Trustee") of the bankruptcy estate of 655 Corporation (the "Debtor").

5. The Defendant, LBM Financial, LLC ("LBM"), is a Massachusetts limited liability company with a principal place of business located at 171 Locke Drive, Marlborough, Massachusetts. Marcello Mallegni ("Mallegni") is the 99% owner and sole manager of LBM. A 1% interest in LBM is held by a company owned by Mallegni.

6. The Reach and Apply Defendant, Cathay Bank ("Cathay"), is a California corporation having a place of business located at 621 Washington Street, Boston, Massachusetts. Cathay is the successor-in-interest to General Bank.

**PROCEDURAL HISTORY**

7. On September 1, 2006, the Debtor filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code (the "Petition Date").

8. On October 4, 2007, this Court entered an Order requiring the Office of the United States Trustee to appoint a Chapter 11 trustee.

9. On October 5, 2007, the Trustee was appointed as the Chapter 11 Trustee of the bankruptcy estate of the Debtor.

**FACTS**

10. The Debtor is a Massachusetts corporation that was formed in 1998 for the purpose of real estate development.

11. The Debtor's sole asset consists of a condominium complex located at 653-659 East Second Street, South Boston, Massachusetts (the "Property") consisting of 18 residential units (the "Condominium Units") and 44 parking spaces (the "Parking Spaces").

**Mallegni's Ownership and Control of the Debtor**

12. Upon information and belief, prior to 2002, 100% of the outstanding shares of the Debtor were held by the FKB Trust. Frank D. Kirby ("Kirby") was the sole trustee of the FKB Trust and Francis K. Fraine ("Fraine"), Robert M. Bradley ("Bradley") and Kirby were the beneficiaries of the FKB Trust. Fraine, Bradley and Kirby are referred to herein as the "655 Shareholders."

13. On March 13, 2002, Kirby, as trustee of the FKB Trust, executed a Stock Transfer Agreement whereby the FKB Trust transferred 50% of the outstanding shares of the Debtor to Marcello Mallegni ("Mallegni") and William Depietri ("Depietri"), individually, and Paul T. Prew, as trustee of the RMB Trust. A true and accurate copy of the Stock Transfer Agreement is attached hereto as Exhibit A.

14. Specifically, the Stock Transfer Agreement allocated the stock that was being transferred as follows: i) Mallegni: 12.5%, ii) Depietri: 12.5%, iii) Paul T. Prew, as trustee of the RMB Trust: 25%.

15. As consideration for the transfer, Mallegni and Depietri agreed to arrange for a loan in the amount of $2,275,000 from Wolfpen Financial, LLC ("Wolfpen"), a Massachusetts limited liability company then owned by Mallegni and Depietri. The purpose of this was loan was to retire the existing obligations that were secured by mortgages on the Property.

16. The Stock Transfer Agreement provided that:

> It is the intent of the parties that Buyer [Mallegni, Depietri and the RMB Trust] shall have complete control of the Corporation's

> affairs through its Directors and a Voting Trust until the loan proceeds of the Refinance is paid in full ***and all or substantially all of the assets of the [Debtor] are sold and the proceeds are distributed.*** *Further, the Seller [FKB Trust] and Buyer [Mallegni, Depietri and the RMB Trust] agree to convey all of the shares of the [Debtor] to be standing in their respective names to* ***Marcello Mallegni, Trustee of the 655 Corporation Voting Trust, to be established at closing.***
>
> See Exhibit A, p. 6 (emphasis added)

17. On March 13, 2002, the same day the Stock Transfer Agreement was executed, the 655 Shareholders entered into an Inducement and Shareholder's Agreement (the "I&S Agreement") with Mallegni and Depietri whereby the 655 Shareholders acknowledged their transfer of 25% of the stock in the Debtor to Mallegni and Depietri in exchange for Mallegni and Depietri's agreement to provide financing in the amount of $2,275,000 to develop the Property and pay off existing debts secured by the Property. A true and accurate copy of the I&S Agreement is attached hereto as Exhibit B.

18. The I&S Agreement provided that Mallegni and DePietri were to receive "their distributive funds or profits based upon the construction costs, plus a five (5.00%) percent contingency set forth above, and the original acquisition costs of Two Million Two Hundred Seventy-five Thousand And 00/100 ($2,275,000.00) Dollars."

19. The I&S Agreement further provided Mallegni and Depietri with "all of the stock voting rights as set forth in a voting trust of even date" and provided them with the authority to "review and approve all contracts, loan agreements, and each and every other cost, fee or expense associated with the development of the property."

20. On March 14, 2002, Kirby, as trustee of the FKB Trust, Prew, as trustee of the RMB Trust, Mallegni and Depietri, in their capacity as shareholders of the Debtor, executed the "655 Corporation Voting Trust" (the "Voting Trust") whereby 100% of the outstanding shares of

the Debtor were transferred to Mallegni, as trustee. A true and accurate copy of the Voting Trust is attached hereto as Exhibit C.

21. As trustee, Mallegni possessed "full and legal title to the Trust Stock…" He was also given the "full and unqualified right and power to vote, and to execute waivers and consents in respect to, all or any of the Trust Stock at all meetings of stockholders for any purpose; and in respect to any and all of the Trust Stock shall possess and be entitled in his discretion to exercise all stockholders' rights of every name and nature…"

22. According to its terms, the Voting Trust could only be terminated either (1) upon the death of the trustee and the beneficiaries, (2) a written instrument terminating the trust executed by the holders of at least 76% of the Debtor's shares, or (3) March 14, 2007.

23. At various times, Mallegni has alleged that the Voting Trust was terminated upon the Debtor's satisfaction of the Wolfpen Loan.

24. In connection with the Chapter 11 filing of Shamus Holdings, LLC (Case No. 07-14572), LBM's counsel, Michael Norris, Mallegni on behalf of Wolfpen, and Mallegni on behalf of LBM, were served with subpoenas pursuant to Fed. R. Bankr. P. 2004 which contained requests for all documents concerning the Wolfpen Loan. In response to those subpoenas, the Stock Transfer Agreement, the I&S Agreement and the Voting Trust were produced, but no document evidencing the termination of the Voting Trust was produced by any of the witnesses.

25. Prior to the filing of this action, the Trustee made written demand upon LBM to produce any documents evidencing that the Voting Trust was ever terminated. No such document has been provided.

26. Upon information and belief, the Voting Trust was never terminated by a writing signed by the holders of 76% of the Debtor's shares, and therefore did not expire any earlier than

March 14, 2007, six months after the Petition Date.

**The Wolfpen Loan**

27. On or about March 13, 2002, Marcello and Depietri, through their company, Wolfpen Financial, LLC, loaned $2,275,000 to the Debtor pursuant to a written promissory note and a mortgage secured by the Property (the "Wolfpen Loan").

28. The Wolfpen Loan had a term of six months and became due and payable in September 2002.

29. Fraine, Bradley and Kirby personally guaranteed the Wolfpen Loan.

30. Upon information and belief, the Debtor never made any payments on the Wolfpen Loan.

31. In the fall of 2002, the Debtor sought a loan from General Bank in the amount of $5,600,000 to complete the construction and development of the Property (the "General Loan").

32. Upon information and belief, the Debtor represented to General Bank that Mallegni would be heavily involved with the development of the Property. Mallegni's purported involvement was one reason for General Bank's approval of the General Loan.

33. Upon information and belief, in order to grant the General Loan to the Debtor, General Bank required the Debtor to invest $1,200,000 of equity in the development of the Property and General Bank required that the mortgage securing the General Loan be in first position on the Property.

34. At or about the time the Debtor sought the General Loan, Depietri was no longer interested in the development of the Property and insisted that his portion ($1,400,000) of the Wolfpen Loan be repaid.

35. Upon information and belief, General Bank only authorized the Debtor to use

$1,598,000 of the proceeds from the General Loan towards the payoff of the Debtor's obligation to Wolfpen.

36. To fulfill General Bank's requirement for an infusion of $1,200,000 in equity, Mallegni, through his company LBM, agreed to "loan" $1,200,000 to the Debtor. The $1,200,000 from LBM combined with the $1,598,000 from General Bank were used to payoff the Wolfpen Loan.

37. Upon information and belief, of the $1,598,000 advanced from General Bank, $1,400,000 was used to pay Depietri his 50% share in the Wolfpen Loan, and approximately $200,000 was paid to Mallegni towards his 50% interest in the Wolfpen Loan.

38. On May 9, 2003, Mallegni caused the Debtor to execute a note in favor of LBM in the amount of $1,200,000 (the "$1.2M Note"). Mallegni, through LBM, collected $48,000 from the Debtor in "points" on this loan. These points were paid from the proceeds of the loan.

39. Even though LBM issued a check in the amount of $1,200,000 to the Debtor to retire the Wolfpen Loan, all of those funds, plus $200,000 of the General Loan, immediately came back to Mallegni as part of his 50% interest in Wolfpen. Mallegni used his control and ownership of the Debtor to extract approximately $248,000 from the Debtor for his benefit.

40. According to the terms of the $1.2M Note, interest accrued on the note at a rate of 16% per annum. The $1.2M Note was secured by a mortgage recorded against the Property and mortgages recorded against various other properties.

41. Upon information and belief, no new money was advanced to the Debtor for the $1.2M Note, as the $1.2M Note was merely a refinance of Mallegni's interest in the Wolfpen Loan. Furthermore, the $1.2M Note was an attempt by Mallegni to characterize his infusion of equity in the Debtor as a "loan."

42. Even though the development of the Property was not anticipated to be complete for more than a year, the $1.2M Note contained a maturity date of September 9, 2003, only four months after it was issued (the "Maturity Date"). The Maturity Date was later extended to April 9, 2004.

43. The $1.2M Note required the Debtor to make monthly interest payments commencing on June 9, 2003 until the maturity date.

44. The Debtor made monthly interest payments on the $1.2M Note only from June 2003 through January 2004 in the total amount of $181,269.36. The Debtor made no payments after January 2004.

45. Upon information and belief, despite the Debtor's default on the $1.2M Note, LBM never issued a notice of default or took any steps to enforce the Debtor's obligation to repay the $1.2M Note.

46. Upon information and belief, while the $1.2M Note was in default and prior to the Petition Date, LBM made additional "loans" to the Debtor, as set forth below, all of which were secured by mortgages upon the Property:

a. March 12, 2004 for $2,000,000 (the "March 2004 Obligation");

b. April 7, 2004 for $418,500 (the "April 2004 Obligation");

c. April 7, 2005 for $850,000 (the "April 2005 Obligation");

d. January 27, 2006 for $2,432,000 (the "January 2006 Obligation").[1]

The foregoing "loans" are collectively referred to as the "LBM Pre-petition Obligations."

47. Upon information and belief, even though the Debtor signed notes and mortgages for the LBM Pre-petition Obligations, LBM provided all of the proceeds of such "loans" to other

[1] Upon information and belief, a portion of the January 2006 Obligation refinanced and consolidated the April 2004 and April 2005 Obligations.

entities.

48. Upon information and belief, Mallegni, through his control of the Debtor pursuant to the Voting Trust, caused the Debtor to provide notes and mortgages to LBM for the LBM Pre-petition Obligations even though the Debtor received no benefit from such "loans."

49. On the date that the Debtor incurred the January 2006 Obligation, the $1.2M Note had been in default for two years and the accrued interest alone was approximately $1,700,000, substantially more than the principal amount owed on the $1.2 Note.

50. Upon information and belief, the Debtor never made any payments to LBM for any of the LBM Pre-petition Obligations and LBM took no steps to collect on such obligations prior to the Petition Date.

51. Upon information and belief, even though the Debtor received no benefit from such "loans," LBM has filed a total of six secured proofs of claim against the Debtor in the total amount of $17,006,393.74, of which two claims totaling $3,828,598.38 are for the LBM Pre-petition Obligations.

52. The three remaining secured claims in the total amount of $10,164,295.53 relate to various guaranties that were provided by the Debtor to secure obligations of other entities. These guaranties were secured by mortgages given by the Debtor and recorded against the Property in December 2003.

53. Upon information and belief, the Debtor received no benefit whatsoever in exchange for the guaranties it provided to LBM.

**DIP Financing**

54. On the Petition Date, the Debtor possessed no working capital to conduct its operations.

55. Notwithstanding the fact that the $1.2M Note had been in default for several years and that all other LBM Pre-petition Obligations were also in default as of the Petition Date, LBM agreed to provide even more financing to the Debtor, as debtor-in-possession, in the amounts of $43,735 and $2,000,000 (the "DIP Loans") to cover the Debtor's operating costs and complete construction of the condominium complex.

56. By written agreement dated August 11, 2006, two weeks prior to the Petition Date, Mallegni, as the owner of LBM and through his ownership and control of the Debtor, directed the Debtor to install Vincent J. DiMento ("DiMento") as President and Director of the Debtor. DiMento's appointment was a condition for LBM to provide the DIP Loans to the Debtor. A true and correct copy of the Management Agreement is attached hereto as Exhibit D.

57. In connection with the $2,000,000 DIP Loan, LBM charged the Debtor with closing expenses and points in the amount of $77,000 which, upon information and belief, were paid to LBM from the loan proceeds.

58. LBM also maintained an "interest reserve" in the amount of $120,500 which, upon information and belief, was funded from the proceeds of the DIP Loan.

59. LBM agreed to subordinate the DIP Loans to the mortgage held by General Bank and mortgages held by New England Phoenix Company.

**The Subordination Agreement**

60. On October 18, 2005, LBM executed a "Subordination Agreement" with Cathay Bank ("Cathay"), successor by merger to General Bank, agreeing to subordinate the $1.2M Note and the LBM Pre-petition Obligations to the General Loan. In exchange, Cathay agreed to pay LBM a "unit release fee" equal to up to 20% of the net sales proceeds of each unit. A true and accurate copy of the Subordination Agreement is attached hereto as Exhibit E.

61. In or about December 2007, Cathay and LBM executed a "Disbursement Agreement" restating the terms of the Subordination Agreement to include the DIP Loan among the obligations that LBM agreed to subordinate to Cathay. The Disbursement Agreement provided, inter alia, that:

> Cathay shall pay to LBM twenty percent (20%) of all Cathay Disbursed Funds.[[2]] Such funds shall be made: (a) in the case of Cathay Disbursed Funds already received by Cathay, within five (5) business days of the execution of this Disbursement Agreement, and (b) in the case of Cathay Disbursed Funds not yet received by Cathay, within five (5) business days of their receipt.
>
> LBM shall pay to Cathay eighty percent (80%) of all LBM Disbursed Funds until such time as the [General] Loan has been satisfied in full. Such payment shall be made within five (5) business days of the receipt of the LBM Disbursed Funds.[[3]]

A true and accurate copy of the Disbursement Agreement is attached hereto as Exhibit F.

62. Since the Trustee's appointment, the Trustee has paid Cathay a total of $4,616,734.24 from net proceeds from the sale of Condominium Units and Parking Spaces.

63. Upon information and belief, since the execution of the Disbursement Agreement, Cathay has paid to LBM "unit release fees" in the total amount of $732,456.78.

64. Upon information and belief, Cathay is holding an additional $180,733 for "unit release fees" due to LBM from the net proceeds forwarded to Cathay for the sale of Condominium Units that closed in September 2008.

65. Upon information and belief, LBM has applied the "unit release fees" to reduce the Debtor's various "loans" to LBM.

---

[2] "Cathay Disbursed Funds" are defined by the Disbursement Agreement as the $2 million in net sale proceeds disbursed by the Trustee to Cathay as of the date of the Disbursement Agreement, and the net sale proceeds that the Trustee would continue to disburse to Cathay until the General Loan was satisfied in full.
[3] The "LBM Disbursed Funds" are defined by the Disbursement Agreement as disbursements made by the Trustee to LBM on account of the DIP Loan.

**COUNT I**
**(Recharacterization – Pre-petition Loans)**

66. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

67. Upon information and belief, the development of the Property was a joint venture between Mallegni and the 655 Shareholders.

68. Upon information and belief, from the date of the execution of the Voting Trust to the Petition Date, Mallegni, as a shareholder of the Debtor and sole trustee of the Voting Trust, controlled the Debtor and was an insider.

69. Upon information and belief, since the Debtor's inception, Mallegni, through "loans" made by his companies, has been the only shareholder to provide any capitalization to the Debtor.

70. Upon information and belief, Mallegni, through LBM, provided the Debtor with $1,200,000 in equity to induce General Bank to make the General Loan to the Debtor.

71. Upon information and belief, Mallegni, through his control and ownership of the Debtor, caused the Debtor to execute notes and mortgages for the $1.2M Note and the LBM Pre-petition Obligations even though the Debtor received no benefit for such "loans."

72. Upon information and belief, the $1.2M Note and the LBM Pre-petition Obligations were not treated as loans by either LBM or the Debtor.

73. Upon information and belief, apart from the few interest payments made by the Debtor towards the $1.2M Note, the Debtor never made any payments to LBM on the LBM Pre-petition Obligations.

74. As a result of the foregoing, the $1.2M Note and the LBM Pre-petition Obligations should be recharacterized as capital contributions by LBM and be subordinated to the allowed claims of general unsecured creditors.

**COUNT II**
**(Recharacterization – DIP Loans)**

75. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

76. Upon information and belief, as of the date of the execution of the Voting Trust and at least until the Petition Date, Mallegni maintained complete control and ownership of the Debtor pursuant to his rights and powers under the Voting Trust.

77. As of the Petition Date, Mallegni, through his company, LBM, agreed to extend the DIP Loans to the Debtor.

78. Upon information and belief, Mallegni never disclosed to the Court his control and ownership of the Debtor while the motion for approval of the DIP Loans was pending before the Court.

79. Upon information and belief, Mallegni, through his control and ownership of the Debtor, caused LBM to extend the DIP Loans in an effort to recover some of his equity investment in the Debtor.

80. Upon information and belief, despite the Debtor's default on the DIP Loans, LBM took no action to enforce the Debtor's obligations.

81. Upon information and belief, the DIP Loans were not treated as loans by either LBM or the Debtor.

82. As a result of the foregoing, the DIP Loans should be recharacterized as capital contributions by LBM and be subordinated to claims of general unsecured creditors.

**COUNT III**
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A § 5(a)(2) – Mortgage Upon $1.2M Note)**

83. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

84. Upon information and belief, LBM provided no consideration to the Debtor for the mortgage that secures the $1.2M Note because that "loan" merely refinanced Mallegni's interest in the Wolfpen Loan. Accordingly, LBM did not receive reasonably equivalent value in exchange for the mortgage granted by the Debtor to LBM to secure the $1.2M Note.

85. Upon information and belief, the Debtor was either insolvent at the time it provided the mortgage or became insolvent as a result of the mortgage it provided to LBM to secure the $1.2M Note.

86. On the date that the mortgage was given to LBM to secure the $1.2M Note, the Debtor was engaged or about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

87. On the date that the mortgage was given to LBM to secure the $1.2M Note, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

88. The mortgage given by the Debtor to LBM to secure the $1.2M Note constituted a fraudulent transfer of property within the meaning of M.G.L. c. 109A, § 5(a)(2).

89. As of the Petition Date, there existed at least one unsecured creditor of the Debtor who maintained the right to avoid the mortgage pursuant to M.G.L. c. 109A, § 5(a)(2).

90. As a result, the Trustee is entitled to avoid, pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A, § 5(a)(2), the mortgage to LBM which secures the $1.2M Note.

**COUNT IV**
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) – Mortgage Upon the January 2006 Obligation)**

91. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

92. Upon information and belief, LBM did not provide any monies to the Debtor in exchange for the mortgage given by the Debtor for the January 2006 Obligation. Accordingly, LBM did not receive reasonably equivalent value in exchange for the mortgage granted by the Debtor to LBM to secure the January 2006 Obligation.

93. Upon information and belief, on the date that the mortgage was given to LBM to secure the January 2006 Obligation, the Debtor was engaged or about to engage in a business or a transaction for which any property remaining with the Debtor was an unreasonable small capital.

94. Upon information and belief, the Debtor was either insolvent at the time it provided the mortgage or became insolvent as a result of the mortgage it provided to LBM to secure the January 2006 Obligation.

95. On the date that the mortgage was given to LBM for the January 2006 Obligation, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

96. The mortgage given by the Debtor to LBM to secure the January 2006 Obligation constituted a fraudulent transfer of property within the meaning of 11 U.S.C. § 548(a)(1)(B).

97. As a result, the Trustee is entitled to avoid the mortgage to LBM which secures the January 2006 Obligation.

**COUNT V**
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and M.G.L. c. 109A § 5(a)(2) – Mortgages Upon LBM Pre-Petition Obligations)**

98. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

99. Upon information and belief, LBM did not provide any monies to the Debtor in exchange for the mortgages given by the Debtor to LBM for the LBM Pre-petition Obligations. Accordingly, LBM did not receive reasonably equivalent value in exchange for the mortgages granted by the Debtor to LBM to secure the LBM Pre-petition Obligations.

100. Upon information and belief, the Debtor was either insolvent at the time it provided the mortgages or became insolvent as a result of the mortgages it provided to LBM to secure the LBM Pre-petition Obligations.

101. On the dates that the mortgages were given to LBM to secure the LBM Pre-petition Obligations, the Debtor was engaged or about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

102. On the dates that the mortgages were given to LBM to secure the LBM Pre-petition Obligations, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

103. The mortgages given by the Debtor to LBM to secure the LBM Pre-petition Obligations constituted fraudulent transfers of property within the meaning of M.G.L. c. 109A, § 5(a)(2).

104. As a result, the Trustee is entitled to avoid, pursuant to 11 U.S.C. § 544(b) and M.G.L. c. 109A, § 5(a)(2), the mortgages which secure the LBM Pre-petition Obligations.

**COUNT VI**
**(Declaratory Relief Pursuant to 11 U.S.C. § 551 – $1.2M Note and LBM Pre-petition Obligations)**

105. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

106. Pursuant to § 551, the Trustee's exercise of his powers of avoidance automatically preserves such interests for the benefit of the bankruptcy estate.

107. As a result of the foregoing, the Trustee seeks a declaration that, as a result of the Trustee's avoidance, pursuant to § 548, § 544 and M.G.L. c. 109A, of the mortgages which secure the $1.2M Note and the LBM Pre-petition Obligations, LBM's interest in such mortgages is automatically preserved for the benefit of the estate pursuant to § 551 of the Bankruptcy Code.

108. The Trustee seeks a further declaration that, pursuant to § 551, the Trustee succeeds to all the rights and benefits enjoyed by LBM pursuant to the mortgages which secure the $1.2M Note and LBM Pre-petition Obligations, including, without limitation, LBM's rights under the Subordination Agreement and the Disbursement Agreement.

**COUNT VII**
**(Avoidance of Post-Petition Transfer Pursuant to 11 U.S.C. § 549)**

109. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

110. Upon information and belief, as of the date of the execution of the Voting Trust and at all times thereafter, Mallegni maintained complete control and ownership of the Debtor pursuant to his rights and powers under the Voting Trust.

111. Upon information and belief, upon the Debtor's application for DIP financing from LBM, Mallegni never disclosed to the Court his control and ownership of the Debtor.

112. Upon information and belief, the DIP financing provided to the Debtor by LBM was not an arm's-length transaction because Mallegni controlled both sides of the transaction.

113. Upon information and belief, LBM agreed to provide DIP financing to the Debtor in order to allow Mallegni to realize a return on his various equity investments in the Debtor.

114. Upon information and belief, LBM maintained an interest reserve and charged substantial fees to the Debtor in connection with the DIP "loans," which were funded from the proceeds of the same.

115. As a result of the foregoing, the mortgage provided by the Debtor to LBM to secure the DIP loan along with the interest reserve and fees paid by the Debtor in connection with the DIP loan constitutes an unauthorized post-petition transfer pursuant to § 549 and is recoverable pursuant to § 550.

**COUNT VIII**
**(Declaratory Relief Pursuant to 11 U.S.C. § 551 – DIP Loans)**

116. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

117. Pursuant to § 551, the Trustee's exercise of his powers of avoidance automatically preserves such interests for the benefit of the estate.

118. As a result of the foregoing, the Trustee seeks a declaration that as a result of the Trustee's avoidance, pursuant to § 549, of the mortgage which secures the DIP Loan, LBM's interest in such mortgage is automatically preserved for the benefit of the estate pursuant § 551 of the Bankruptcy Code.

119. The Trustee seeks a further declaration that, pursuant to § 551, the Trustee succeeds to all the rights and benefits enjoyed by LBM pursuant to the mortgage which secures

the DIP Loan including, without limitation, LBM's rights under the Subordination Agreement and the Disbursement Agreement.

**COUNT IX**
**(Recovery of "Unit Release Fees" Paid to LBM Post-Petition)**

120. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

121. The Trustee's avoidance of LBM's mortgages which secure various "loans" by LBM allows the Trustee to preserve the benefit of such mortgages for the benefit of the estate.

122. As a result, the Trustee, as the successor to LBM's interest to the mortgages that secure the various "loans," is entitled to receive the "unit release fees" due to LBM pursuant to the Subordination Agreement and the Disbursement Agreement.

123. After the Petition Date, LBM received $732,456.78 in "unit release fees" from Cathay.

124. The Trustee is entitled to a judgment against LBM in the amount of $732,456.78 for the "unit release fees" received by LBM after the Petition Date.

**COUNT X**
**(Injunctive Relief for the "Unit Release Fees" Due to LBM from By Cathay)**

125. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

126. The Trustee's avoidance of LBM's mortgages which secure various "loans" by LBM allows the Trustee to preserve the benefit of such mortgages for the benefit of the estate.

127. As a result, the Trustee, as the successor to LBM's interest in various "loans," is entitled to receive the "unit release fees" due to LBM pursuant to the Subordination Agreement and the Disbursement Agreement for the benefit of the bankruptcy estate.

128. The Trustee is entitled to a preliminary injunction against Cathay, its agents, officers, directors, employees and attorneys enjoining them from distributing any further "unit release fees" to LBM pending a final disposition of this case in order to maintain the status quo so that such monies can be preserved for the benefit of creditors of the estate.

129. The Trustee is entitled to a preliminary injunction against LBM, its agents, officers, directors, employees and attorneys enjoining them from receiving any further "unit release fees" from Cathay pending a final disposition of this case in order to maintain the status quo so that such monies can be preserved for the benefit of creditors of the estate.

130. The Trustee will suffer irreparable harm if injunctive relief is not granted because LBM will likely dissipate any "unit release fees" that it receives from Cathay, thus preventing the Trustee from being able to collect such fees from LBM.

**COUNT XI**
**(Reach and Apply — M.G.L. c. 214, § 3 – "Unit Release Fees" Held by Cathay)**

131. The Plaintiff repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

132. The Trustee anticipates that he will recover a judgment against LBM in the amount of at least $732,456.78 for "unit release fees" recovered by LBM after the Petition Date.

133. As an alternative remedy, the Trustee is entitled to reach and apply all "unit release fees" due from Cathay to LBM to satisfy any judgment recovered against LBM and to establish an equitable lien in the Trustee's favor against the "unit release fees."

WHEREFORE, the Plaintiff respectfully requests this Court enter a judgment:

i) pursuant to Count I, recharacterizing as equity all pre-petition loans made by LBM and cancelling the mortgages that secure such loans;

ii) pursuant to Count II, recharacterizing as equity the debtor-in-possession financing made by LBM and cancelling the mortgage that secures such loan;

iii) pursuant to Count III, avoiding, as a fraudulent transfer pursuant to M.G.L. c. 109A, the mortgage securing the $1.2M Note given by the Debtor to LBM;

iv) pursuant to Count IV, avoiding, as a fraudulent transfer pursuant to § 548(a)(1)(B) of the Code, the mortgage securing the January 2006 Obligation as a fraudulent transfer;

v) pursuant to Count V, avoiding, as fraudulent transfers pursuant to M.G.L. c. 109A, the mortgages securing the LBM Pre-Petition Obligations;

vi) pursuant to Count VI, declaring that the mortgages avoided pursuant to § 548 and M.G.L. c. 109A are preserved for the benefit of the estate pursuant to § 551, and that the Trustee succeeds to the benefits enjoyed by LBM pursuant to such mortgages, including, without limitation, LBM's rights under the Subordination Agreement and the Disbursement Agreement;

vii) pursuant to Count VII, avoiding, as an unauthorized post-petition transfer pursuant to 11 U.S.C. § 549, the mortgage granted by the Debtor to LBM in connection with the DIP Loan;

viii) pursuant to Count VIII, declaring that the mortgage avoided pursuant to § 549 is preserved for the benefit of the estate pursuant to § 551, and that the Trustee succeeds to the benefits enjoyed by LBM pursuant to such mortgage including, without limitation, LBM's rights under the Subordination Agreement and Disbursement Agreement;

ix) pursuant to Count IX, entering a judgment against LBM in the amount of $732,456.78 for the "unit release fees" recovered by LBM after the Petition Date;

x) pursuant to Count X, granting a preliminary injunction against Cathay, its agents, officers, directors, employees and attorneys enjoining them from distributing any further "unit release fees" to LBM pending a final disposition of this case so that such monies can be preserved for the

benefit of creditors of the estate;

xi) pursuant to Count X, granting a preliminary injunction against LBM, its agents, officers, directors, employees and attorneys enjoining them from receiving any further "unit release fees" from Cathay pending a final disposition of this case so that such monies can be preserved for the benefit of creditors of the estate;

xii) in the alternative, pursuant to Count XI, granting an equitable lien upon the "unit release fees" due from Cathay in the amount of $723,456.78;

xiii) in the alternative, pursuant to Count XI, reaching and applying the amounts due from Cathay to LBM towards the judgment recovered against LBM;

xiv) granting such other and further relief as this Court deems just and equitable, including interest, costs and attorney's fees.

Respectfully submitted,

MARK G. DEGIACOMO, CHAPTER 11
TRUSTEE OF 655 CORPORATION,

By his attorneys,

/s/ Taruna Garg

Thomas S. Vangel, BBO #552386
Michael P. Connolly, BBO #637642
Taruna Garg, Esq. BBO # 654665
Murtha Cullina LLP
99 High Street
Boston, MA 02110
617-457-4000
617-482-3868

Dated: October 3, 2008